KING, HOLMES, PATERNO & SORIANO, LLP
HOWARD E. KING, ESQ., STATE BAR NO. 77012
HKING@KHPSLAW.COM
JOHN G. SNOW, ESQ., STATE BAR NO. 280790
JSNOW@KHPSLAW.COM
1900 AVENUE OF THE STARS, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90067-4506
TELEPHONE: (310) 282-8989
FACSIMILE: (310) 282-8903

Attorneys for Plaintiffs JACOB L. NYGARD p/k/a CAKE NYGARD, DONGLEE HAN, CLARE MAGUIRE, and ANTONIUS WIRIADJAJA p/k/a FOOD MASKU

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| JACOB L. NYGARD p/k/a CAKE NYGARD, an individual; DONGLEE HAN, an individual; CLARE MAGUIRE, an individual; and ANTONIUS WIRIADJAJA p/k/a FOOD MASKU, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>TAYLOR WHITLEY p/k/a TAYLOR.WTF, an individual,<br><br>Defendant. | CASE NO.<br><br>**COMPLAINT FOR:**<br><br>**(1) VIOLATIONS OF DIGITAL MILLENNIUM COPYRIGHT ACT ("DMCA") (17 U.S.C. § 512(f));**<br>**(2) BREACH OF FIDUCIARY DUTY;**<br>**(3) BREACH OF WRITTEN CONTRACT; AND**<br>**(4) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**DEMAND FOR JURY TRIAL** |

5862.060/1794533.1
COMPLAINT

Plaintiffs Jacob L. Nygard p/k/a "Cake Nygard" ("Nygard"), Donglee Han ("Han"), Clare Maguire ("Maguire"), and Antonius Wiriadjaja p/k/a "Food Masku" ("Wiriadjaja" and collectively with Nygard, Han, and Maguire, "Plaintiffs") allege as follows:

## INTRODUCTION AND FACTS COMMON TO ALL CLAIMS

1. This action arises from the unhinged, destructive, and egotistical acts of Plaintiffs' former collaborator and joint venture partner, Defendant Taylor Whitley p/k/a "taylor.wtf" ("Whitley"), to sabotage a successful digital art project and brand they started together, known as "Caked Apes," after Whitley failed to usurp ownership and control of the project entirely for himself.

2. In summary, after the project's initial success, Whitley (1) engaged a "lawyer"—who on information and belief does not actually have a license to practice law (which Whitley knew)—to threaten to "come after" Plaintiffs if they did not renegotiate their original joint venture agreement with him, (2) falsely claimed he was the sole owner of the project, and (3) demanded he was entitled to ***more than three times*** the share of revenue from the project than was originally agreed to between the parties in writing. Then, Whitley waged an online smear campaign to try to publicly bully Plaintiffs into acquiescing to his unreasonable and unfounded demands. When those efforts failed, Whitley filed multiple false "takedown notices" under the Digital Millennium Copyright Act ("DMCA") to have the collection removed from online marketplaces, falsely claiming the project was derived entirely from his intellectual property and that he never granted Plaintiffs a license to use that intellectual property. Those online marketplaces relied on Whitley's false notices to remove the collection from their websites, causing the immediate outrage of the project's collectors and customers, preventing the continuing sales of the works, and ultimately harming the future value of the works.

3. Whitley's claims in the DMCA takedown notices were demonstrably false for at least three reasons. **First,** the project was based primarily on original art

created solely by Nygard, not Whitley. **Second,** Nygard and Maguire independently held rights to the pre-existing intellectual property on which certain elements of the project were based (thereby authorizing them to create the derivative elements of the project's works). And **third,** to the extent a license was needed from Whitley because he also held rights to similar pre-existing intellectual property, Whitley unambiguously granted Plaintiffs a perpetual, non-exclusive license, *in writing*, to create derivative works from his intellectual property in exchange for 10% of the project's sales proceeds (which he has received). In sum, there was no justifiable basis for Whitley to submit the takedown notices, which he sent in bad faith.

4. Plaintiffs bring this action to recover damages for the harm caused by Whitley's actions, to put a stop to his wrongful behavior, and to preserve and protect the value of the "Caked Apes" project and brand.

### *Background on Plaintiffs and NFT Art*

5. Plaintiffs are accomplished digital artists, content creators, and pioneers in the new, cutting-edge world of "NFT" art, also known as "crypto" art.

6. NFT art—or "Non-Fungible Token" art—is a form of digital art that relies on the same "blockchain" technology that underpins cryptocurrencies such as Bitcoin. The technology allows digital art creators to assign unique identification codes to their digital art pieces that cannot be replicated, thereby making the process of buying, selling, collecting, and trading digital art more efficient, while reducing the probability of fraud.[1] Its advent has caused an explosion of the digital art market and the collection and sale of unique digital assets.

7. In 2021, NFT's rose to prominence in the contemporary-art world, highlighted by the sale of one piece by Christie's Auction House for more than 69 million U.S. dollars.[2] Additionally, Forbes reported that there were more than $2.5

---

[1] https://www.investopedia.com/non-fungible-tokens-nft-5115211.

[2] https://www.newyorker.com/culture/2021-in-review/the-year-the-art-scene-

billion in NFT sales in the first half of 2021 alone. As Forbes stated:

> Welcome to the world of non-fungible tokens (NFTs), which are being regarded by many as the new frontier of revenue generation, specifically with regard to the arts. The term non-fungible means there is no equivalent for which the item can be exchanged. When it comes to NFTs, blockchain technology is used to establish the uniqueness and ownership of a piece of digital art, which is then sold via a platform. Furthermore, each sale of this art is recorded on the blockchain, creating a digital provenance that is inalterable by anyone.[3]

8. As relevant to this dispute, one of the most successful NFT art projects to date is known as the "Bored Ape Yacht Club," which is a digital art collection of 10,000 cartoon apes, each with its own unique set of traits, including facial expressions and outfits. Because they are limited in number, among other reasons, the ownership of an official "Bored Ape" has become a status symbol, with celebrities including Stephen Curry, Jimmy Fallon, Paris Hilton, Eminem, and Justin Bieber being reported as current owners. In January 2022, Bieber reportedly purchased his Bored Ape for $1.29 million.[4]

9. A unique characteristic of the Bored Ape brand is that it not only permits, but also encourages owners to create derivative works from their apes, which has led to a number of spin-off projects and brands that have become

---

rebounded-expanded-and-surrendered-to-nfts ("You can't discuss art in 2021 without mentioning N.F.T.s. Non-fungible tokens stormed the gates of the contemporary-art establishment in March, when Beeple, the nom de keyboard of the digital artist Mike Winkelmann, sold a crypto-art work at Christie's for more than sixty-nine million dollars.").

[3] https://www.forbes.com/sites/forbesbusinesscouncil/2021/09/07/rise-of-a-new-disruptor-how-nfts-are-revolutionizing-the-art-and-entertainment-worlds/?sh=3567f17e1a90

[4] https://pagesix.com/2022/01/31/justin-bieber-buys-bored-ape-nft-for-1-3m/

successful in their own right. As one of the Bored Ape founders explained, "Anything that people create with their apes only grows the brand." The New Yorker reported that Bored Ape owners have used their cartoon images to brand lines of craft beer, create YouTube series, and design skateboard decks, among other things.[5]

10. Because the price of owning an original Bored Ape is so high, a large market for derivative apes has developed, with Bored Ape owners and their licensees creating derivative brands and "communities" that include "Mutant Apes," "Apocalyptic Apes," "Apes In Space," and of particular importance to this case, "Caked Apes."

11. The creation of these derivative works is expressly authorized by the terms and conditions of Bored Ape ownership, which grants owners "an unlimited, worldwide license to use, copy, and display the purchased Art for the purpose creating derivative works based upon the Art" with no restriction on "earning revenue from any of the foregoing."

### *The Creation of "Caked Apes"*

12. In or about November 2021, Plaintiffs and Whitley—who had met each other in online art communities—began to discuss working together to create and promote a Bored Ape derivative project. Because Plaintiff Maguire owned a Bored Ape, Plaintiff Nygard owned three Mutant Apes (which were created by the same founders of Bored Apes and granted similar rights to create derivative works), and Whitley owned eleven Bored Apes, they were each permitted to create their own derivative ape projects.

13. Additionally, in June 2021, Whitley sold Nygard and Maguire each a digital product he created that he called a "Floppy Disk." Whitley said the Floppy

---

[5] https://www.newyorker.com/culture/infinite-scroll/why-bored-ape-avatars-are-taking-over-twitter

Disk, which cost Nygard approximately $50 and Maguire approximately $200, gave access to his NFTs "that you can use in your NFT projects." By its terms, Whitley's Floppy Disk gave purchasers, including Nygard and Maguire, a perpetual, non-exclusive license to use Whitley's digital assets, including his Bored Apes, in their own derivative NFT projects.

14. When Plaintiffs and Whitley initially discussed creating a Bored Ape derivative brand, the idea was for both Nygard and Whitley to create and contribute original art to the project. However, when it came time to actually execute on the idea, Nygard was the only person who contributed any original drawing to the project.

### *Nygard Alone Creates Caked Ape Art*

15. In the end, Nygard created original art for 8,888 unique "Caked Ape" NFTs. As an artist, Nygard goes by the name "Cake Nygard." His Caked Ape creations mixed the basic features of apes underlying the Bored Ape and Mutant Ape collections with his own original style of art that portrayed the Apes as covered in birthday cake, frosting, and candles with bright neon colors.

16. When Nygard shared his works with Whitley, Whitley was astounded. In direct messages with Nygard, Whitley wrote: "Dude I went through like 25 of them and they are so f****** good man. I got emotional for real." Whitley later wrote that one of his "biggest regrets in life" was "not drawing for this project."

17. As a favor and nod to Whitley, Nygard incorporated traits of some of Whitley's works from his "Floppy Disk" collection—including elements of Whitley's online "taylor.wtf" persona—into a small subset of the "Caked Apes" collection (less than 5 percent). At the time, Whitley expressed how thrilled he was, fully aware he had contributed no drawing of his own to the project. Despite that knowledge, Whitley began promoting himself on social media as a "founder" of Caked Apes.

### *The Agreement to Execute, Promote, and Split Proceeds from Caked Apes*

18. While Nygard was the sole content creator for "Caked Apes," all Plaintiffs and Whitley had agreed to work together to execute and promote the project, sharing the profits through agreed-upon percentages. Because Maguire, Han, and Wiriadjaja were recognized and well-regarded digital artists and creators themselves, had successfully launched their own NFT projects in the past, and had their own networks of followers, their involvement added further value to the project and was crucial to its success.

19. In written electronic messages between Plaintiffs and Whitley, they agreed on the following percentages for primary sales of Caked Apes:

- Nygard would receive 50%;
- Whitley would receive 10%;
- 10% would go to an independent code developer with whom they contracted;
- Maguire, Han, and Wiriadjaja would each receive 5%; and
- the balance would be set aside to promote the project.

20. Because the technology underlying NFTs also allows creators to take a percentage of secondary sales, Plaintiffs and Whitley agreed that the same percentages would apply to secondary sales, with the exception that the independent code developer would no longer take a percentage and such share would instead go to the fund used to continue to promote the project.

21. While Whitley had previously sold Nygard and Maguire the rights to use his NFT collection to create derivative works, in electronic messages he argued for and demanded 10% of proceeds from Caked Apes "for licensing the apes." For example, on or about January 4, 2022, Whitley wrote to Plaintiffs:


taylor.wtf 01/04/2022
lets do 5% to all partners. 10% to me for licensing the apes. 10% to business fund and 50% to cake

22. While Plaintiffs believed purchasing an additional license from Whitley was unnecessary to execute the project (because Whitley had already granted Nygard and Maguire a license, and because they owned their own pre-existing apes that allowed them to create derivative works), Plaintiffs agreed to grant Whitley his requested 10% of sales proceeds thereby removing any possible doubt that Whitley had authorized any use of his pre-existing art in the project. In electronic communications with Plaintiffs, Whitley expressed his unambiguous agreement to the ultimate terms listed above, including in the following messages in which Whitley wrote, "Agreed on all"[6]:

> **Clare Maguire** 01/07/2022
> I agree with the percentages above for primary sales. I agree that secondary will be same or nervous 10% rolling over to WTF and WTF getting that 10%. I am happy for Foodmasku to make gnosis wallet and ETH to be distributed from there.
>
> **foodmasku** 01/07/2022
> And we agreed to drop down the magic minting to 350
>
> **Clare Maguire** 01/07/2022
> yes
>
> **taylor.wtf** 01/07/2022
> Agreed on all
>
> **Cake Nygard** 01/07/2022
> Yes agreed on everything above thank you all
>
> **Clare Maguire** 01/07/2022
> thank you

---

[6] To be clear, the reference to "10% rolling over to WTF" in the excerpted messages refers to 10% of secondary sales going to the "group wallet" the team created for the funds earmarked to continue to promote Caked Apes, not to a percentage rolling over to Whitley, who goes by "taylor.wtf." The team referred to the group wallet as "WTF" because, at the time, they called the joint venture behind Caked Apes "wtf.industries," which was separate and distinct from Whitley aka "taylor.wtf."

### *The Initial Success of "Caked Apes"*

23. Plaintiffs first offered the "Caked Apes" collection for sale on or about January 10, 2022. It was an immediate success, selling out in seconds—a fact Whitley himself bragged about on social media. Thereafter, Caked Apes saw significant trading in the secondary market, where the average price for a Caked Ape rose by the day.

24. In connection with the project, Whitley received his own Caked Ape, which he shared on social media, enthusiastically stating, "MY FIRST APE IS SO DOPE!!! Thank you @CakeNygard what a sick drop."

25. Because Plaintiffs and Whitley built their agreed-upon percentages into the "smart contracts" associated with the NFTs, Plaintiffs and Whitley automatically received their respective agreed-upon percentages from the project until Whitley had it wrongfully removed from online marketplaces.

### *Whitley's Wrongful Conduct and Bad Faith Attempt to Renegotiate the Agreement*

26. During the course of "working" on the Caked Apes project, Whitley contributed almost nothing of value to the project, began to behave erratically, and became mentally abusive to other team members, particularly to Maguire who was spearheading the operational management of the project. Whitley would scream at Maguire on the phone, belittle her, hang up on her mid-phone call, and give her confusing and mixed commands, all while doing nothing himself to aid the project. Plaintiffs often witnessed Whitley's erratic behavior during group meetings. Whitley created a toxic and hostile work environment in which Maguire increasingly felt unsafe when communicating with Whitley.

27. After Whitley recognized the financial success of the Caked Apes project, he attempted to usurp ownership and control of the project entirely for himself. Specifically, in late January 2022, Whitley engaged a woman who publicly claimed to be an NFT "lawyer"—but who on information and belief did not actually

possess a law license, a fact that Whitley knew—to intimidate Plaintiffs into renegotiating the initial (and mutually agreed upon) terms for the project. In written messages to Plaintiffs, sent at the direction of Whitley, the woman alleged that "it appears there is a misappropriation of Taylor's IP and brand" and threatened to "come after [Plaintiffs] for misuse." Later, Whitley, through his representatives, demanded that he was "entitled to at least 30% of the net revenues from the Caked Apes project." Because Plaintiffs and Whitley had already discussed and agreed on percentages *in writing at the inception of the project*, they rightfully disregarded this ridiculous demand.

28. Through his representatives, Whitley also demanded immediate access to the Caked Apes social media accounts, something he never had before, as the parties had agreed Nygard and Maguire would control the project's official accounts. Because Whitley was becoming more and more irrational and aggressive in his behavior, Plaintiffs declined his request for access to the Caked Apes accounts to protect the brand, fearing that he was preparing to take action that would be further destructive to the project.

### *Whitley Publicly Disparages and Harms Caked Apes*

29. Thereafter, Whitley confirmed Plaintiffs' worst fears as he began to air his dispute with Plaintiffs on social media from his personal accounts, including to the Caked Apes community, portraying himself as the victim of a plot to remove him from the project "[f]or reasons that are unclear" and claiming he was wrongfully blocked from accessing the official social media accounts. However, at all times, Whitley was still credited as being associated with the project on the Caked Apes website, and Whitley continued to receive his agreed-upon 10% share of proceeds from primary and secondary sales. Additionally, at no point was Whitley promised any access—let alone inalienable access—to the social media accounts, which were created by Maguire, who the parties agreed would be in charge of the operational management of the project.

KING, HOLMES, PATERNO & SORIANO, LLP

5862.060/1794533.1

10

COMPLAINT

30. Whitley's social media posts from his personal accounts severely harmed the project by bringing a cloud of uncertainty and negative attention to it. Not only did the average price of Caked Apes in secondary markets start to fall after Whitley's online posts, but collectors and members of the community also began to express concern over Whitley's troubling behavior and the continuing effect it may have on the project.

### *Whitley's False DMCA Notice*

31. Not satisfied with his first attempts to sabotage the "Caked Apes" project, Whitley took destructive steps to harm not only Plaintiffs but also the collectors and owners of the Caked Apes NFTs. Between February 27, 2022, and March 1, 2022, Whitley filed false DMCA "takedown requests" with "OpenSea" and "Rarible," two of the largest online marketplace for NFTs, asking to have the entire Caked Apes collection removed from their websites. In the requests, Whitley made numerous false statements under penalty of perjury, including: (1) that Caked Apes used his image and likeness without his permission, (2) that "I am the sole and wholly owner [sic] of the underlying BAYC [Bored Ape Yacht Club] NFTs contained in the Caked Apes artwork," and (3) that "I have not in the past nor do I intend to grant the operators of the Caked Apes a license to use my business logo or likeness or a sublicense of my BAYC's NFTs."

32. Whitley's statements in his takedown request were knowingly and demonstrably false. **First,** Whitley granted Plaintiffs permission and a license to use his Bored Apes and aspects of his online image and likeness (which, notably, appear in less than 5% of the Caked Apes collection) in the Caked Apes project when he (1) sold Nygard and Maguire his "Floppy Disk" product that granted them those rights, for $200 each, and (2) encouraged and approved the sale of Caked Apes, and agreed to receive 10% of the proceeds, which he negotiated as a "license" for his works. **Second,** Whitley knew he was not the sole owner of the Bored Apes on which the project was based because he knew Maguire herself owned a Bored Ape,

and Nygard owned three Mutant Apes, which granted them the rights to create derivative works.

33. Relying on Whitley's false statements, in or about early March 2022, OpenSea and Rarible removed the collections from their websites, bringing a halt to secondary sales (from which Plaintiffs and Whitley had been receiving continuing royalties) and causing the immediate outrage of collectors and followers. Whitley then proudly proclaimed on Twitter that he was responsible for removing the collection and claimed Plaintiffs were "lying" when they said they had the rights to host the collection.

34. Caked Apes collectors on Twitter were confounded. One responded to Whitley's posts stating: "I don't understand [because] you helped release the collection. WE bought it ~ collectors own it . . . The images were released [with] mutual consent to public that purchased them. Our images we bought in good faith just got stolen."

35. Another wrote that Whitley "just prove[d] they [Plaintiffs] were right to remove you from" the social media accounts, and that "I bought @CakeNygard art. not yours, you filing some BS claim it is yours doesnt change that."

36. A third stated that while they had been a longtime "loyalist" of Whitley, they refused to "sit by and be lied to, and harmed financially because someone's ego was hurt." The collector noted the dishonesty in Whitley's actions because Whitley had previously sang Nygard's praises on live Internet radio shows and stated he was "happy to play a small part in cake's project," so the collector was "shock[ed]" to see Whitley "making claims about stolen IP." The collector shared that Whitley directly contacted the collector after the initial posts and falsely claimed he "made 0 on this" project:

> I actually got nothing. I made 0 on this.
>
> You don't know the truth and I understand it's emotional but you are way off base man. It isn't about money. I need tpo protect my project.
>
> 4:05 PM

37. This was another demonstrably false claim because the blockchain technology on which the project was built created an unalterable digital trail showing Whitley received his agreed-upon 10% of every primary and secondary Caked Ape sale.

38. While Plaintiffs hoped to avoid the time and expense of litigation, Whitley's conduct and refusal to act in good faith to resolve the issues herein has left Plaintiffs no choice but to file this action to enforce their rights, put a stop to Whitley's irrational efforts to destroy the successful project that he himself continues to profit from, and repair the reputational damage that Whitley is inflicting on Plaintiffs and the project on social media.

## JURISDICTION AND VENUE

39. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. Sections 1331 and 1338(a) because claims herein arise under the United States Copyright Law, 17 U.S.C. Sections 101 *et seq*. Additionally, jurisdiction over the additional related state law claims asserted herein is conferred by 28 U.S.C. section 1367.

40. Venue is proper in this District pursuant to 28 U.S.C. Sections 1391 and 1400 because Whitley resides in this District and a substantial part of the events giving rise to the claims herein occurred in this District.

## THE PARTIES

41. Plaintiff Nygard is a resident of the State of Minnesota.

42. Plaintiff Maguire is a resident of the United Kingdom.

43. Plaintiff Han is a resident of the State of California, Orange County.

44. Plaintiff Wiriadjaja is a resident of the State of New York.

45. Upon information and belief, Whitley is a resident of the State of California, County of San Bernardino.

## FIRST CLAIM FOR RELIEF

## (Violations of DMCA § 512(f))

46. Plaintiffs incorporate every allegation contained above as if fully set forth herein.

47. 17 U.S.C. Section 512(f) provides that "[a]ny person who knowingly materially misrepresents under this section . . . that material or activity is infringing . . . shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer . . . who is injured by such misrepresentation, as the result of [a] . . . relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing."

48. On at least two instances in 2022, Whitley willfully, knowingly, and materially made third-party Section 512(f) misrepresentations to OpenSea and Rarible stating that the Caked Apes collection was infringing intellectual property rights owned by Whitley.

49. In reliance on Whitley's misrepresentations, OpenSea and Rarible removed the collections in early March 2022, harming the value of the collection, causing the outrage of Caked Apes collectors and customers and the loss of goodwill, and preventing Plaintiffs from continuing to receive revenues from secondary sales.

50. Plaintiffs seek damages, injunctive relief, and attorneys' fees for Whitley's bad-faith conduct under 17 U.S.C. Section 512(f).

## SECOND CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

51. Plaintiffs incorporate every allegation contained above as if fully set forth herein.

52. Plaintiffs and Whitley entered a joint venture for the purpose of producing and promoting Caked Apes. The parties agreed to share profits from the sales of Caked Apes through agreed-upon percentages.

53. By virtue of their joint venture, the parties owed fiduciary duties to each other, including the duties of undivided loyalty, care, and good faith and fair dealing.

54. Plaintiffs at all times placed their trust and confidence in Whitley that he would faithfully honor his fiduciary duties to Plaintiffs.

55. Whitley breached his fiduciary duties by, among other things, (1) obstructing the marketing and sale of Caked Apes, and (2) falsely claiming that Plaintiffs do not have the rights necessary to promote and sell Caked Apes, thereby damaging the value of Caked Apes and the goodwill of Plaintiffs' collectors and customers.

56. As a direct and proximate result of Whitley's breaches of his fiduciary duties, Plaintiffs suffered substantial injury and continue to suffer substantial injury and damages in an amount to be determined at trial.

57. Plaintiffs are informed and believe and allege on that basis that Whitley engaged in the foregoing wrongful conduct willfully, fraudulently, oppressively, and maliciously, with the intent to injure Plaintiffs. As a result, Plaintiffs are entitled to exemplary and punitive damages in an amount sufficient to punish Whitley and to deter him as well as others from such conduct in the future.

## THIRD CLAIM FOR RELIEF

### (Breach of Written Contract)

58. Plaintiffs incorporate every allegation contained above as if fully set

forth herein.

59. In or about January 2022, Plaintiffs and Whitley entered a written, perpetual, non-exclusive license agreement to allow Plaintiffs to incorporate Whitley's intellectual property into the Caked Apes collection in exchange for Whitley's receipt of 10% of primary and secondary sales.

60. Additionally, in or about June 2021, Nygard and Maguire entered into written, perpetual, non-exclusive license agreements with Whitley that allowed them to use Whitley's NFTs in their own derivative works, in exchange for approximately $50 from Nygard and approximately $200 from Maguire.

61. Plaintiffs performed all the obligations, covenants, and conditions required of them under the agreements, except to the extent any such obligations, covenants, or conditions have been excused, prevented, or waived by Whitley's acts and omissions.

62. Whitley breached the agreements by filing DMCA takedown notices with OpenSea and Rarible to have the Caked Apes collection removed from their websites, falsely claiming the collection incorporated Whitley's intellectual property for which Plaintiffs did not have a license.

63. Whitley has further unlawfully anticipatorily repudiated the license agreements by denying that Plaintiffs have a license to use his intellectual property in derivative works. Plaintiffs are entitled to treat this anticipatory repudiation as a breach of the otherwise valid and enforceable contract.

64. Plaintiffs have been damaged by Whitley's breach of the contract in an amount in excess of $125,000.00 to be proven at trial, plus prejudgment interest thereon.

## FOURTH CLAIM FOR RELIEF

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

65. Plaintiffs incorporate every allegation contained above as if fully set forth herein.

66. In or about January 2022, Plaintiffs and Whitley entered a written, perpetual, non-exclusive license agreement to allow Plaintiffs to incorporate Whitley's intellectual property into the Caked Apes collection in exchange for Whitley's receipt of 10% of primary and secondary sales.

67. Additionally, in or about June 2021, Nygard and Maguire entered into written, perpetual, non-exclusive license agreements with Whitley that allowed them to use Whitley's NFTs in their own derivative works, in exchange for approximately $50 from Nygard and approximately $200 from Maguire.

68. In every contract, there is an implied promise of good faith and fair dealing. This means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract.

69. Whitley violated his duty to act fairly and in good faith imposed on him by filing DMCA takedown notices with OpenSea and Rarible to have the Caked Apes collection removed from their websites, falsely claiming the collection incorporated Whitley's intellectual property for which Plaintiffs did not have a license, and by claiming publicly that Plaintiffs did not have a license to create derivative works incorporating his intellectual property. By taking such action, Whitley breached the implied covenant of good faith and fair dealing and thereby deprived Plaintiffs of the ability to enjoy the benefits of the license agreements.

70. Plaintiffs have been damaged by Whitley's breach of the implied covenant of good faith and fair dealing in an amount in excess of $125,000.00 to be proven at trial, plus prejudgment interest thereon.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Whitley as follows:

1. For compensatory and actual damages according to proof at trial but in no event less than $125,000.00;

2. For pre- and post-judgment interest at the maximum rate permitted by law;

3. For exemplary damages in an amount according to proof;

4. For such fees and costs (including reasonable attorneys' fees) incurred herein as permitted by law;

5. For Whitley and his agents, servants, employees, and all parties in privity with him to be enjoined preliminarily and permanently from directly or indirectly interfering with Plaintiffs' rights to the Caked Apes collection, including their rights to sell and host the collection on the OpenSea and Rarible platforms; and

6. For such other and further relief as the Court deems just and proper.

DATED: March 20, 2022          KING, HOLMES, PATERNO & SORIANO, LLP


By:    */s/ John G. Snow*
          HOWARD E. KING
          JOHN G. SNOW
Attorneys for Plaintiffs JACOB L. NYGARD p/k/a CAKE NYGARD, DONGLEE HAN, CLARE MAGUIRE, and ANTONIUS WIRIADJAJA p/k/a FOOD MASKU

## DEMAND FOR JURY TRIAL

Plaintiffs JACOB L. NYGARD p/k/a CAKE NYGARD, DONGLEE HAN, CLARE MAGUIRE, and ANTONIUS WIRIADJAJA p/k/a FOOD MASKU hereby demand a jury trial of this action.

DATED: March 20, 2022          KING, HOLMES, PATERNO & SORIANO, LLP


By: ___*/s/ John G. Snow*___
HOWARD E. KING
JOHN G. SNOW
Attorneys for Plaintiffs JACOB L. NYGARD p/k/a CAKE NYGARD, DONGLEE HAN, CLARE MAGUIRE, and ANTONIUS WIRIADJAJA p/k/a FOOD MASKU

5862.060/1794533.1
COMPLAINT